# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

---

Merel Evans Bishop,                      **Civil No. 14-1898 (ADM/SER)**

      Plaintiff,

v.                                      **REPORT AND RECOMMENDATION**

Lucinda Jesson, Nancy Johnston, Kevin
Moser, Steve Sajdak, Joanne Christenson,
Brian Erickson, and Lisa Kuklis in their
individual and official capacities,

      Defendants.

---

      Merel Evans Bishop, *pro se*, Moose Lake, Minnesota.

      Aaron Winter and Kristy L. Burdick Cariveau, Esqs., Minnesota Attorney General's Office, Saint Paul, Minnesota, for Defendants.

---

STEVEN E. RAU, United States Magistrate Judge

      The above-captioned case comes before the undersigned on Defendants Lucinda Jesson, Nancy Johnston, Kevin Moser, Steve Sajdak, Joanne Christenson, Brian Erickson, and Lisa Kuklis's (collectively "Defendants") Motion to Dismiss [Doc. No. 55], and a Pro Se Motion for Leave to File Amicus Curiae on Behalf of Plaintiff ("Motion for Amicus Curiae") [Doc. No. 61] filed by Kenneth Steven Daywitt ("Daywitt"), on behalf of Plaintiff Merel Evans Bishop ("Bishop"). This matter was referred for the resolution of pretrial matters pursuant to 28 U.S.C. § 636(b)(1)(B)–(C) and District of Minnesota Local Rule 72.1. For the reasons stated below, the Court recommends that Defendants' Motion to Dismiss be granted in part and denied in part, and that the Motion for Amicus Curiae be denied.

I. **BACKGROUND**

A. **Procedural Background**

Bishop was committed to the Minnesota Sex Offender Program ("MSOP") in 2001. (Second Am. Compl.) [Doc. No. 54 ¶¶ 2, 31]. Currently Bishop is at the MSOP facility in Moose Lake, Minnesota (the "Moose Lake facility"), which is operated by the Department of Human Services ("DHS"). (*Id.* ¶ 2). Lucinda Jesson ("Jesson") was the Commissioner of DHS.[1] (*Id.* ¶ 10). Nancy Johnston ("Johnston") is the Executive Director of the MSOP, and Kevin Moser ("Moser") is the Director. (*Id.* ¶¶ 11, 12). Steve Sajdak ("Sajdak") is the Program Manager of the Moose Lake facility's kitchen, Joanne Christenson ("Christenson") is the Kitchen Supervisor, and Brian Erickson ("Erickson") is the Chief Cook. (*Id.* ¶¶ 13–15). Lisa Kuklis is the registered dietician at the Moose Lake facility. (*Id.* ¶ 16).

Bishop filed his original Complaint on June 12, 2014. (Compl.) [Doc. No. 1]. Defendants filed a motion to stay, which this Court denied. (Order Dated Dec. 11, 2014) [Doc. No. 30]. Bishop subsequently amended his complaint on two occasions, and Defendants now move to dismiss the Second Amended Complaint. *See* (Order Dated Dec. 31, 2014) [Doc. No. 33]; (First Am. Compl.) [Doc. No. 35]; (Report & Recommendation Dated July 17, 2015) [Doc. No. 52]; (Order Dated Aug. 12, 2015) [Doc. No. 53]; (Second Am. Compl.); (Mot. to Dismiss).[2]

---

[1]   Jesson is no longer the Commissioner of DHS, a matter which will be addressed more thoroughly below. *See infra.*

[2]   The specific procedural background that led to this matter proceeding on the Second Amended Complaint is provided in the above-cited orders and report and recommendation. Because this procedural background is not relevant to the matters now before the Court, the Court does not summarize that background here.

B.      **Factual Background**[3]

Bishop is "an observant Jewish patient who attempts to adhere to the Orthodox Jewish school of thought" and who believes in eating kosher meals. (Second Am. Compl. ¶ 30). Bishop alleges that although kosher food service has been implemented at the Moose Lake facility, there have been "many issues with the quantity/quality of the food." (*Id.* ¶ 33). Bishop alleges that the food has been "inedible," spoiled or expired, and "foul smell[ing]." (*Id.* ¶¶ 27, 33–35, 66). In addition, Bishop alleges that Defendants have "put[] non-kosher items such as cream puffs which contained lard" in his meals, have "mix[ed] meat and dairy products together," and have served eggs, vegetables, cupcakes, and other foods without a proper kosher label. (*Id.* ¶ 36). Bishop asserts that "[e]very time . . . a non-kosher item is placed in a food container it invalidates the kosherness" of what was previously kosher food, unless the kosher food is a "hot meal" that is individually sealed. (*Id.*).

With respect to his allegation that kosher food offerings were spoiled, Bishop alleges that Defendants "Sajdak, Christenson, Erickson, and Kuklis" stated that "the vendor told them that the food could be stored in the freezer for up to two (2) years" and would "still be safe to eat." (*Id.* ¶ 26). Bishop alleges this was "not true," as he contacted "the vendor of the products in question and was told that nothing over 6 months would be appropriate for storing in a freezer." (*Id.*). He further alleges that he has "submitted numerous requests up the chain of communication regarding the poor quality of food and lack of quantity," and submitted a grievance regarding

---

[3]      The Court notes that some allegations in Bishop's Second Amended Complaint include vague references to matters relevant to the pursuit of a class action. *See, e.g.*, (Second Am. Compl. ¶ 21) (stating that "[c]ommon questions of law and fact exist as to all"). Bishop does not, however, seek class treatment or class-wide relief. *See, e.g.*, (*id.* ¶ 19) (stating that Bishop "brings this action" only "on behalf of himself").

these matters. (*Id.* ¶ 39). Bishop's grievance was denied and he was told that his request was "not appropriate." (*Id.*).

Bishop alleges that the poor quality and low quantity of kosher food caused "everyone," including Bishop, to quit eating the kosher meals. (*Id.* ¶ 44). Bishop resumed eating kosher meals, however, "after Passover . . . in 2014." (*Id.*). The "kosher food product" at MSOP has "been changed" three times "since its inception at the MSOP." (*Id.* ¶ 35). Bishop also asserts that another MSOP client previously "was the 'go to' person regarding the kosher food diet" and attempted to find "a quality product that the MSOP could serve," but that these efforts were met with assertions that those products were not cost effective or were unavailable because of "a contract issue." (*Id.* ¶ 25). This other MSOP client stopped eating kosher food due to medical issues. (*Id.*).

Bishop further alleges that the kosher meals offered at the Moose Lake facility do not satisfy "the standards of the American Dietetic Association for adult males," and that the caloric values of kosher meals differ considerably from those of the non-kosher meals. (*Id.* ¶ 37). Specifically, those eating non-kosher meals "receive anywhere between 2600–3000 calories per day" while Bishop alleges that at a "maximum" he receives "1200–1600 calories" per day. (*Id.*). Bishop alleges that the "National Research Council states that an adult male who is over 50 and moderately active should receive a minimum of 2200–2400 calories to maintain a healthy diet"—a caloric intake much greater than Bishop alleges he receives when adhering to a kosher diet.[4] (*Id.* ¶ 38). Bishop alleges that he "gave kitchen staff a menu" reflecting only the kosher

---

[4]     Relatedly, Bishops states that the individual hot kosher meals served at the Moose Lake facility have a maximum caloric value of 300 calories, which is insufficient to sustain "a male of [Bishop's] age, . . . physical activity, and health needs." (*Id.* ¶ 36).

meals "that did not contain the non-kosher items for their reference," but that they "refused to utilize [his] suggestions." (*Id.* ¶ 36).

Bishop, who is diabetic, has suffered "extremely low blood sugar, due to . . . lack of proper caloric intake" since starting back on kosher meals in 2014 and has lost "excessive weight." (*Id.* ¶¶ 24, 32). Bishop's low blood sugar episodes have resulted in "Health Services being called to bring glucose packs in the middle of the night, to assist in bringing [Bishop's] blood sugar back to a normal range." (*Id.* ¶ 32); *see also* (*id.* ¶ 40) (noting "many incidents of low blood sugar" requiring use of "glucose packets" or food that "is not kosher due to the mixing of meat and dairy"). Bishop asserts that he has lost approximately eighty-five pounds since he began eating kosher meals, in contrast to other clients within the MSOP who "eat the regular meal [and] maintain their weight, without problems." (*Id.* ¶ 37). He further asserts that he has had his insulin reduced on many occasions due to his insufficient diet and states that he "no longer receives insulin due to weight loss and low food intake." (*Id.* ¶ 41). He alleges that he has submitted "requests" and a grievance "regarding his issues with low blood sugar and rapid weight loss due to the poor quality of food which was either inedible," non-kosher, or was "low in caloric intake." (*Id.* ¶ 27). "Defendants responded to these request[s] with vague answers or without answering the question at all." (*Id.*). Bishop alleges that he has been "seen by MSOP's dietician"—Kuklis—"whom he has complained to about the food quality, and the lack of quantity." (*Id.* ¶ 41).

Bishop also alleges that he submitted "requests and a grievance" to Defendants to permit a "volunteer rabbi" to "provide training to Defendants' [sic] regarding the proper handling of kosher food." (*Id.* ¶ 43). "Defendants denied the requests . . . , stating that it violates policy to allow volunteers into the kitchen," though Bishop has been unable to find the applicable policy.

(*Id.*). Bishop believes Defendants will not allow a volunteer rabbi to come in to the Moose Lake facility because of "the many violations that may be discovered in the kitchen." (*Id.*). Bishop later alleges, however, that Defendants ultimately agreed "to allow for said training," though they "will not allow the rabbi in the facility kitchen as is necessary" for the inspection of Defendants' practices, kitchen, and food. (*Id.* ¶ 93).

In addition to the allegations discussed above, Bishop makes several additional allegations related to each Defendant. With respect to all Defendants, Bishop generally alleges that Defendants, in both their individual and official capacities, "implemented, retained, and carried out a policy and/or *de facto* standing practice of serving inedible, improper and inadequate kosher meals and non-kosher meals as kosher meals, by the inclusion of non-kosher foods and provision[] or service in a non-kosher manner." (*Id.* ¶¶ 10–16). He also alleges that "violations" were "brought to their attention and there was no action taken to correct the problem." (*Id.* ¶ 18).

Bishop also asserts that Jesson "is responsible in her individual and official capacity to assure that the MSOP is meeting constitutional standards and Minnesota law." (*Id.* ¶ 10).

With regard to Johnston, Bishop alleges that as the Executive Director of the MSOP, Johnston is responsible for ensuring that MSOP clients "within her care" are receiving "proper food as described in Minnesota Rule[] 4665.2900." (*Id.* ¶ 11).

As to Moser, Bishop states that he "continued to allow the service of" inadequate kosher food "even after [Bishop] brought to the attention of [Moser] . . . the inadequate meals, and the poor quality of the food." (*Id.* ¶ 12).

With regard to Sajdak, Christenson, Erickson, and Kuklis, Bishop alleges that these Defendants have "no official training in the food service industry, specifically related to Kosher

food handling" and that even after he "brought to [their] attention . . . the poor quality, the possibility of freezer burn or being spoiled, and the deficient caloric intake nothing was improved." (*Id.* ¶¶ 13–16). As to Kuklis, Bishop states that as "the Registered Dietician at the MSOP she is in charge of planning meals, making sure that the meals comport with the standards set . . . by the American Dietetic Association and assuring that [Bishop] receives adequately nutritional meals." (*Id.* ¶ 16).

Based on the above facts, Bishop alleges four counts against Defendants. (*Id.* ¶¶ 50–93). Count I refers to the First Amendment, the Fourteenth Amendment, the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), and article 1, section 16 of the Minnesota Constitution. (*Id.* ¶¶ 51–56). Count I refers to the previous allegations in the Second Amended Complaint and alleges that Defendants were "each aware of the policies and/or *de facto* practices that were implemented at MSOP the purpose of which was to punish [Bishop] rather than to treat him and yet they each did nothing to change these policies and practices or to prevent this conduct from occurring and actively participated in such conduct." (*Id.* ¶ 57).

Count II refers to the First Amendment, the Fourteenth Amendment, RLUIPA, and article 1, sections 2 and 16 of the Minnesota Constitution. (*Id.* ¶¶ 59–64, 70). In Count II, Bishop alleges that "[b]ased on the policy and procedures created and implemented by Defendants," Bishop has been subject to "limitations that impose upon" his religious obligation to eat kosher food, including limitations posed by nutritionally inadequate kosher food, expired kosher food, and once-kosher food that has been tainted by non-kosher food, as well as the resulting "risk for low blood sugar or poisoning which could be detrimental to [his] health." (*Id.* ¶¶ 65–66). Similar to other allegations in the complaint, Bishop alleges that Defendants "were each aware of the kosher food that was implemented . . . at the [Moose Lake] facility and continued to do nothing

7

about it to prevent this product from being served nor stopped this from continuing and actively participated in such conduct." (*Id.* ¶ 69).

Count III refers to the First Amendment, the Fourteenth Amendment, article 1, section 5 of the Minnesota Constitution, and Minnesota Rule 4665.3000; repeats the allegations in paragraphs 65–66 of Count II; and states that because Bishop is not being provided "proper caloric intake" his health has suffered, resulting in "inhumane treatment." (*Id.* ¶¶ 74–80, 82). Bishop again alleges in Count III that Defendants "were each aware of the kosher food that was implemented . . . at the [Moose Lake] facility and continued to do nothing about it to prevent this conduct from continuing and actively participated in such conduct," adding that Defendants were "informed on numerous occasions that . . . bologna was . . . expired." (*Id.* ¶ 81).

Finally, Count IV refers to the First Amendment and RLUIPA. (*Id.* ¶¶ 86, 90). Bishop recounts his request that a volunteer rabbi be permitted to train staff regarding proper kosher food handling and recounts Defendants' initial denial of this request and later agreement to allow for staff training regarding kosher food handling, though not in the kitchen at the Moose Lake facility. (*Id.* ¶¶ 87, 93). He further alleges that Defendants have an "affirmative duty to assure that their employees are properly trained in the field [in] which they are working in" and suggests that they have failed in this duty in light of the "numerous violations of kosher laws which [Bishop] has brought to their attention, yet Defendants choose to act in the same manner." (*Id.* ¶ 88). Bishop alleges that Defendants "implemented policies at the facility to not allow for volunteers to provide proper training regarding kosher food handling and continued to do nothing to prevent this conduct from continuing" and states that "[t]hese policies . . . are not related to a legitimate institutional or therapeutic interest." (*Id.* ¶¶ 89, 91). Bishop further alleges in Count IV that Moser, Sajdak, Christenson, Erickson, and Kuklis "actively participated in such

conduct even after they were informed of the volunteer rabbis' [sic] willingness to assist in providing proper training." (*Id.* ¶ 92). Based on the above counts, Bishop seeks various forms of relief, including declaratory relief, prospective injunctive relief, and damages. (*Id.* ¶¶ 19, 20, pp. 26–27).

As described above, the counts in the Second Amended Complaint are somewhat unclear and appear to overlap. For instance, while Count I refers to policies or practices implemented at the MSOP for the purposes of punishing Bishop rather than treating him, the Second Amended Complaint alleges no policies or practices beyond those related to the service of kosher food and kosher-food-related training. *See generally* (*id.*). In addition, Counts I, II, and III all appear to be based on deficiencies in and the effects of the inadequacies in the kosher food service provided at the Moose Lake facility and all assert claims under the First Amendment, the Fourteenth Amendment, RLUIPA, and various state laws, or some combination of these sources of law. *See* (*id.* ¶¶ 50–83). Count IV, however, is focused exclusively on the denial of Bishop's request to have a volunteer rabbi come to the Moose Lake facility kitchen to train staff regarding proper kosher food handling. (*Id.* ¶¶ 84–93).

Considering all of the above and in light of the allegations in the Second Amended Complaint, the Court understands Bishop's Second Amended Complaint to assert the following claims: (1) a First Amendment claim based on the inadequacies in the kosher food service provided at the Moose Lake facility; (2) due process claims based the inadequacies in the kosher food service provided at the Moose Lake facility; (3) a RLUIPA claim based on the inadequacies in the kosher food service provided at the Moose Lake facility; (4) claims under various provisions of the Minnesota Constitution and Minnesota Rule 4665.3000 based on the inadequacies in the kosher food service provided at the Moose Lake facility; (5) a First

9

Amendment claim based on the denial of Bishop's request to allow a volunteer rabbi into the Moose Lake facility kitchen to train staff regarding proper kosher food handling; and (6) a RLUIPA claim based on the denial of Bishop's request to allow a volunteer rabbi into the Moose Lake facility kitchen to train staff regarding proper kosher food handling.[5] *See generally* (Second Am. Compl.).

## II.   DISCUSSION

### A.   Motion to Dismiss

#### 1.   Legal Standard

Defendants move to dismiss Bishop's Second Amended Complaint under Federal Rule of Civil Procedure 12(b)(6). (Mem. of Law in Supp. of Mot. to Dismiss Second Am. Compl., "Defs.' Mem. in Supp.") [Doc. No. 56 at 1]. To state a cause of action that will survive a Rule 12(b)(6) motion, a complaint must allege a set of facts, which, if proven true, would entitle the plaintiff to legal redress against the named defendants under an established legal theory. *Martin v. Aubuchon*, 623 F.2d 1282, 1286 (8th Cir. 1980). In short, "the complaint must allege facts, which if true, state a claim as a matter of law." *Id.* When deciding a Rule 12(b)(6) motion to dismiss, a court generally may not consider materials outside the pleadings and assumes all facts alleged in the complaint are true, construing all reasonable inferences from those facts in the light most favorable to the complainant. *Noble Sys. Corp. v. Alorica Cent., LLC*, 543 F.3d 978, 982 (8th Cir. 2008); *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview*

---

[5]     This understanding of Bishop's claims is consistent with his response in opposition to the Motion to Dismiss. *See* (Pl.'s Mem. in Opp'n to Defs.' Mot. to Dismiss Pl.'s Second Am. Compl., "Bishop's Mem. in Opp'n") [Doc. No. 65 at 6–11] (arguing that Bishop has stated an actionable freedom of religion claim under the First Amendment, a Fourteenth Amendment claim "regarding his religious freedom," a claim under RLUIPA, and arguing that his state law claims should not be dismissed).

*Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. "[I]n fulfilling its duty to liberally construe a civil-rights pleading," a court is not required to "divine the litigant's intent and create claims that are not clearly raised," nor is the court required to "read or construct an argument into a civil-rights pleading." *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 840 (8th Cir. 2004). Likewise, while *pro se* complaints "are to be held to less stringent standards than formal pleadings drafted by lawyers, a district court should not assume the role of advocate for the pro se litigant, nor may a district court rewrite a [complaint] to include claims that were never presented." *Semler v. Ludeman*, No. 09-cv-0732 (ADM/SRN), 2010 WL 145275, at *5 (D. Minn. Jan. 8, 2010) (Montgomery, J. adopting report and recommendation of Nelson, Mag. J.) (internal quotation marks and citations omitted).

Defendants also cite Federal Rule 12(b)(1) as a basis for their Motion to Dismiss. (Defs.' Mem. in Supp. at 1). Rule 12(b)(1) states that a party may move to dismiss a claim for lack of subject matter jurisdiction. Defendants' arguments regarding the applicability of Eleventh Amendment immunity implicates the Court's subject matter jurisdiction over certain claims and is a challenge to the Second Amended Complaint based on the face of the complaint, rather than the truthfulness of any allegations therein. *See* (Defs.' Mem. in Supp. at 28–29). "In a facial challenge to jurisdiction, such as the one before this Court, review is restricted to the pleadings and affords the non-moving party the same protections that it would receive under a Rule

12(b)(6) motion to dismiss." *Beaulieu v. Ludeman*, No. 07-cv-1535 (JMR/JSM), 2008 WL 2498241, at *5 (D. Minn. June 18, 2008) (Rosenbaum, C.J., adopting report and recommendation of Mayeron, Mag. J.).

### 2. Analysis

Defendants move, on various grounds, for dismissal with prejudice of all claims in the Second Amended Complaint. (Defs.' Mem. in Supp. at 31). The Court begins by addressing several broader issues that bear on Bishop's ability to proceed against Defendants, and then addresses the substance of Bishop's claims, as well as his ability to proceed against particular Defendants with respect to those claims.

### a. Eleventh Amendment Immunity

Based on the Eleventh Amendment, Defendants seek dismissal of any claims for damages brought against them in their official capacities, as the Court lacks subject matter jurisdiction over such claims. (Defs.' Mem. in Supp. at 28–29). It is not entirely clear from Bishop's complaint that he seeks damages against Defendants in their official capacities, though his response in opposition to the Motion to Dismiss suggests that he does. *See* (Second Am. Compl. ¶ 5) (stating that Bishop "seeks compensatory and actual or nominal damages based on the Defendants' actions in their individual capacity to violate [Bishop's] constitutional, statutory, and common law rights"), *but see* (*id*. at p. 26) (requesting damages and "that judgment be entered against Defendants"); *see also* (Bishop's Mem. in Opp'n at 16–17) ("Defendants Jesson, Johnston, and Moser all qualify to be held liable for monetary damages in their official capacity.").

To the extent Bishop seeks monetary damages against any Defendant in their official capacity, the Court recommends that those claims be dismissed for lack of subject matter jurisdiction.

> Under the Eleventh Amendment, federal courts do not have subject matter jurisdiction over a claim against a state for damages that has not consented to the suit. This immunity extends to state officials as well since "a suit against a state official in his or her official capacity is [not] a suit against the official but rather is a suit against the official's office [and] is no different from a suit against the State itself."

*Beaulieu*, 2008 WL 2498241, at *7 (citation omitted) (quoting *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989)). Defendants are state officials, and to the extent Bishop is suing Defendants in their official capacity, the real party in interest is the state of Minnesota. *See id.*; *see also* (Second Am. Compl. ¶¶ 10–16). "Congress did not abrogate the states' immunity" when it enacted § 1983. *Mashak v. Minnesota*, No. 11-cv-473 (JRT/JSM), 2012 WL 928225, at *10 (D. Minn. Jan. 25, 2012) (Mayeron, Mag. J.) *report and recommendation adopted by* 2012 WL 928251 (Mar. 19, 2012). "Minnesota has not waived its immunity from § 1983 claims," nor has Minnesota consented to this suit. *See id.* Thus, the Eleventh Amendment bars any claim for damages against Defendants in their official capacities, and the Court recommends dismissal of those claims with prejudice. *Daniels v. Jesson*, No. 13-cv-736 (JNE/SER), 2014 WL 3629874, at *4 (D. Minn. July 22, 2014) (Ericksen, J., adopting report and recommendation of Rau, Mag. J.) ("The Eleventh Amendment protects the State, and the arms of the State, from liability for monetary damages in a Section 1983 action." (internal quotation marks omitted)).

### b.    Minnesota Claims

Bishop appears to assert claims under article 1, sections 2, 5, and 16 of the Minnesota Constitution and Minnesota Rule 4665.3000. *See, e.g.*, (Second Am. Compl. ¶¶ 54, 62, 70, 82).

Defendants argue that these state law claims must be dismissed for several reasons. (Defs.' Mem. in Supp. at 23–27).

As an initial matter, the Court concludes that any state law claim against Defendants in their official capacities must be dismissed. As noted above, the Eleventh Amendment bars a suit in federal court for damages brought against a state official in his or her official capacity. *Beaulieu*, 2008 WL 2498241, at *7. Although "the Supreme Court has long recognized an exception to Eleventh Amendment immunity permitting suits in federal court against state officials alleged to have violated **federal law**, at least where the relief sought is only injunctive," this "exception does not extend to allow such suits based on pendent state-law claims even if the relief sought is limited to prospective injunctive relief." *Minn. Pharmacists Ass'n v. Pawlenty*, 690 F. Supp. 2d 809, 815 (D. Minn. 2010) (Frank, J.) (emphasis added). Therefore, the Court recommends dismissal of any state law claim against Defendants in in their official capacities, regardless of the relief Bishop seeks. *See id.*

Second, to the extent Bishop asserts a claim based on Minnesota Rule 4665.3000, the Court recommends that this claim be dismissed because this rule does not provide a private right of action. "In Minnesota, a rule adopted by an administrative agency has the force of law. Minn. Stat. § 14.38. A Minnesota law, however, does not give rise to a civil cause of action unless the language of the [law] is explicit or it can be determined by clear implication." *Nelson v. Williams*, Civil Action No. 13-181 (PJS/LIB), 2014 WL 5464159, at *4 (D. Minn. Oct. 27, 2014) (Schiltz, J., adopting report and recommendation of Brisbois, Mag. J.) (alteration in original) (internal quotation marks omitted). To determine "whether a Minnesota law implicitly authorizes a private cause of action, Minnesota courts 'consider three factors: (1) whether the [plaintiffs] belong to a special class of persons for whose benefit the statute was enacted, (2) whether the

legislature indicated an intent to create or deny a private remedy, and (3) whether inferring a private remedy would be consistent with the underlying purpose of the legislation.'" *Id.* at *5 (alteration in original) (quoting *All. for Metro. Stability v. Metro. Council*, 671 N.W.2d 905, 916 (Minn. Ct. App. 2003)).

Minnesota Rule 4665.3000 articulates dietary regulations for residential facilities licensed by DHS and the Minnesota Department of Health. Minn. R. 4665.0200, subpt. 1, 4665.3000. The rule states that at such a facility, the "food and nutritional needs of residents shall be met in accordance with their needs and shall meet the dietary allowances, as stated in the Recommended Dietary Allowances, National Academy of Sciences, seventh edition, 1968" and further provides "specified servings per day" in five food groups that "will satisfy this requirement." Minn. R. 4665.3000. Nothing in the rule explicitly provides for a private cause of action and considering the relevant factors, the Court cannot conclude that a private right of action is clearly implied. Minnesota Rule 4665.3000 is part of a regulatory system setting forth minimum standards for the "operation of supervised living facilities insofar as they relate to . . . the health, treatment, comfort, safety, and well-being of the persons accommodated for care," and Bishop therefore arguably belongs to the class of persons for whose benefit the rules were promulgated.[6] *See* Minn. R. 4665.0200, subpt. 1.

However, rather than revealing an intent to create a private remedy for residents of the facilities or suggesting that inferring such a private remedy would be consistent with the underlying purpose of the regulation, the Court's review of the regulations demonstrates that Minnesota Rule 4665.3000 is part of a regulatory system that addresses licensure requirements for supervised facilities. *See, e.g.*, Minn. R. 4665.0300 ("A license shall be issued by the

---

[6]   This assumes, of course, that the cited regulations apply to the Moose Lake facility, a matter which neither party has specifically addressed.

commissioner of health to an applicant who satisfactorily meets all requirements contained in these regulations."). Failure to comply with the minimum requirements is addressed by the imposition of monetary fines and increased fines after failure to remedy a previously noticed violation. *See* Minn. R. 4665.9030 (establishing fine of $350 for violation of Rule 4665.3000), 4665.9100 ("If, upon subsequent reinspection after a fine has been imposed under parts 4665.9000 to 4665.9090, the deficiency has still not been corrected, another fine shall be assessed. This fine shall be double the amount of the previous fine."). In this context, there is no clear implication that a private cause of action was created by Minnesota Rule 4995.3000. Bishop's arguments that Minnesota Rule 4995.3000 clearly requires certain food service/dietary standards are unavailing; what must be clearly implied is not the substantive standards of the regulation but a private right of action based on the failure to comply with those standards. *See* (Bishop's Mem. in Opp'n at 14–15). For the reasons stated above, no such clear implication is found. Therefore, the Court recommends that any claim based on Minnesota Rule 4995.3000 be dismissed with prejudice.[7]

---

[7]     In response to Defendants' argument regarding Minnesota Rule 4995.3000, Bishop refers to a case cited by Defendants that discusses the private right of action authorized under Minnesota Statute section 151.061, subdivision 2. (Bishop's Mem. in Opp'n at 15). Minnesota Statutes section 151.061, subdivision 1 states that any person who is engaged in the business of distributing prescription drugs and who

> discriminate[s] between purchasers by selling prescription drugs at a lower price or rate to one purchaser or association of purchasers than offered to another purchaser or association of purchasers within this state (other than at retail) after making allowance for the difference, if any, in the grade, quality, or quantity, and after equalizing the distance from the point of distribution and freight costs therefrom, shall be guilty of unfair discrimination.

Subdivision 2 explicitly provides for a private cause of action for anyone injured by the unfair discrimination described in subdivision 1. Bishop "would equate not being served an adequate kosher diet [to] discrimination" which would "fall under the purview of . . . Minn. Stat. § 151.061 subd. 2 and [he] should be allowed to bring this civil action." (Bishop's Mem. in Opp'n at 15). Not only is Bishop's apparent attempt to amend his complaint with a new assertion in his response to the Motion to Dismiss inappropriate, but the type of discrimination prohibited in

Finally, the Court must address Bishop's claims against Defendants in their individual capacities based on the Minnesota Constitution. Bishop relies on the following provisions of the Minnesota Constitution: article 1, sections 2, 5, and 16. (Second Am. Compl. ¶¶ 54, 62, 70, 82). Defendants argue that Bishop's claims under the Minnesota Constitution must be dismissed because Minnesota law does not provide a private right of action for violations of the Minnesota Constitution. (Defs.' Mem. in Supp. at 26). The Court acknowledges that there is authority supporting Defendants' argument. *See, e.g.*, *Jihad v. Fabian*, Civil No. 09-1604 (SRN/LIB), 2011 WL 1641767, at *3 (D. Minn. May 2, 2011) (Nelson, J.); *Fearing v. St. Paul Police Dep't*, No. 02-4744 (ADM/JSM), 2005 WL 914733, at *5 (D. Minn. Apr. 20, 2005) (Montgomery, J.). There is also, however, authority to the contrary, particularly as it relates to article 1, section 16.

In *Brooks v. Roy*, the court noted that "[w]hile defendants claimed that the Minnesota Constitution does not provide for a private remedy, Minnesota case law suggests otherwise as it relates to Article 1, § 16." 881 F. Supp. 2d 1034, 1053 n.12 (D. Minn. 2012) (Mayeron, Mag. J., as adopted by Nelson, J.) (citation omitted) (collecting cases); *see also Am. Civil Liberties Union of Minn. v. Tarek ibn Ziyad Acad.*, 788 F. Supp. 2d 950, 957 (D. Minn. 2011) (Frank, J.) (concluding that "private parties have the right to assert challenges under the Minnesota Establishment Clause," which is contained within article 1, section 16 of the Minnesota Constitution). Thus, Defendants' blanket assertion that no private right of action exists under the Minnesota Constitution is unpersuasive. *See Brooks*, 881 F. Supp. 2d at 1053 n.12. In addition, Defendants do not engage in any analysis regarding the specific state constitutional provisions at issue in Bishop's complaint, nor does Defendants' authority address with specificity whether a private right of action exists under the constitutional provisions cited by Bishop. *See* (Defs.'

---

Minnesota Statute section 151.061—unfair price discrimination in the selling of prescription drugs—is unrelated to the alleged misconduct at issue in this case.

Mem. in Supp. at 26); *Riehm v. Engelking*, Civil No. 06-293 (JRT/RLE), 2007 WL 37799, at *8

(D. Minn. Jan. 4, 2007) (Tunheim, J.); *Guite v. Wright*, 976 F. Supp. 866, 871 (D. Minn. 1997)

(Tunheim, J.). Therefore, the Court denies the Motion to Dismiss to the extent Defendants argue

that Bishop's claims under the Minnesota Constitution must be dismissed because they are not

actionable. Moreover, because Defendants do not argue for dismissal of these claims on their

merits, the Court does not engage in further analysis of Bishop's claims based on the Minnesota

Constitution.[8]

### c.  Federal Constitutional Claims

Before discussing Bishop's federal claims, the Court notes that Bishop brings his claims

under 42 U.S.C. § 1983, which provides that "[e]very person who, under color of any statute,

ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any

citizen of the United States or other person within the jurisdiction thereof to the deprivation of

any rights, privileges, or immunities secured by the Constitution and laws," will be "liable to the

party injured in an action at law, suit in equity, or other proper proceeding for redress." "To

successfully plead a § 1983 civil rights cause of action, . . . a complainant must allege a set of

historical facts, which, if proven true, would demonstrate that the named defendant(s) violated

the complainant's federal constitutional rights while acting under color of state law." *Knutson v.*

*Ludeman*, Civil No. 10-357 (PJS/LIB), 2011 WL 821253, at *4 (D. Minn. Jan. 12, 2011)

(Brisbois, Mag. J.), *report and recommendation adopted as modified*, 2011 WL 808189 (Mar. 1,

---

[8]      As discussed below, the Court does not recommend dismissal of all of Bishop's federal claims, and therefore does not separately address Defendants' argument regarding supplemental jurisdiction over Bishop's state law claims. *See* (Defs.' Mem. in Supp. at 27) ("Should the Court dismiss [Bishop's] federal law claims against Defendants, but decline to otherwise dismiss [his] claims under the Minnesota Constitution, the Court need not accept supplemental jurisdiction over [Bishop's] claims under the Minnesota Constitution against individual-capacity defendants.").

2011). In addition, "'[l]iability under section 1983 requires a causal link to, and direct responsibility for, the deprivation of rights' protected by the Constitution." *Id.* (alteration in original) (quoting *Madewell v. Roberts*, 909 F.2d 1203, 1208 (8th Cir. 1990)). The Court begins by addressing whether Bishop has sufficiently pled a violation of any of his federal constitutional rights, and will then address matters regarding Defendants' involvement in and responsibility for those alleged violations.

### i.     First Amendment Claims

"To successfully plead a violation of the First Amendment's freedom of exercise [clause], [Bishop] must plead facts sufficient to demonstrate that Defendants placed a substantial burden on [his] ability to practice [his] religion." *Daywitt v. Minnesota*, Civ. No. 14-4526 (MJD/LIB), 2015 WL 4094199, at *8 (D. Minn. July 6, 2015) (Brisbois, Mag. J., as adopted by Davis, J.) (internal quotation marks omitted); *see also Weir v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997) ("As an initial matter, a person claiming that a governmental policy or action violates his right to exercise his religion freely must establish that the action substantially burdens his sincerely held religious belief."). In order to substantially burden the free exercise of religion, a

> governmental action must significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion.

*Id.* (alterations in original) (internal quotation marks omitted). Once a person demonstrates that his sincerely held religious beliefs have been substantially burdened, and does so in the context of civil commitment, courts in this district have historically applied a modified version of the multi-factor test announced in *Turner v. Safely*, 482 U.S. 78, 89–91 (1987). *See Daywitt*, 2015 WL 4094199, at *8. In doing so, the court "'considers . . . [a] Plaintiff['s] First Amendment

claims in light of appropriate therapeutic interests as well as relevant safety and security concerns.'" *Id.* (quoting *Karsjens v. Jesson*, 6 F. Supp. 3d 916, 937 (D. Minn. 2014) (Frank, J.)).

While Bishop appears to contest the applicability of *Turner* or a modified *Turner* test, *see* (Bishop's Mem. in Opp'n at 7), the Court need not determine the precise standard to apply. Defendants' argument with regard to the merits of Bishop's First Amendment claims is that Bishop has failed to plead any substantial burden on his right to freely exercise his religion, not that, even if Bishop's free exercise rights have been substantially burdened, the alleged burden is permissible under a modified *Turner* analysis. *See* (Defs.' Mem. in Supp. at 12–14). That is, Defendants' argument regarding the merits of Bishop's First Amendment claims rises and falls on the question of whether Bishop has pled sufficient facts to support his assertion that his free exercise rights have been substantially burdened by government action. *See* (*id.*); *Weir*, 114 F.3d at 820.

Defendants contend that Bishop has failed to plead that "his ability to engage in a kosher diet per sincerely held religious beliefs" has been substantially burdened because the facts alleged by Bishop are not "egregious" enough, constituting "*de minimus* allegations" that are "insufficient to support a constitutional claim."[9] (Defs.' Mem. in Supp. at 12–13). Defendants do not separately address whether Bishop has stated a First Amendment free exercise claim based on the denial of Bishop's request to allow a volunteer rabbi into the Moose Lake facility kitchen to train staff regarding proper kosher food handling but, for the reasons discussed above, the Court understands Bishop's Second Amended Complaint to assert two distinct claims under the First Amendment and addresses those allegations accordingly.

---

[9] While Defendants mention Bishop's sincerely held religious beliefs at this point in their memorandum, they do not dispute the sincerity of Bishop's desire to maintain a kosher diet, nor does it appear to the Court that such an issue would be amenable to resolution on a motion to dismiss.

With regard to inadequacies in the kosher food provided at the Moose Lake facility, Defendants' argument that Bishop has failed to state a claim because he has pled only a "*de minimis*" burden on his free exercise rights is not persuasive. Defendants characterize Bishop's complaints about kosher food as complaints about "the quality and quantity of his kosher meals." (Defs.' Mem. in Supp. at 13). This characterization, however, does not fully account for the nature of the allegations in the Second Amended Complaint. As described in detail above, Bishop alleges that although there has been an attempt to implement kosher food service at the Moose Lake facility, the food served is spoiled, inedible, and actually non-kosher due to the manner in which it has been served or prepared. (Second Am. Compl. ¶¶ 27, 33–35, 66). To the extent that kosher food is available, Bishop alleges that it is so nutritionally inadequate that eating the kosher food has resulted in extreme weight loss of eighty-five pounds and episodes of extremely low blood sugar, which have in turn resulted in "Health Services being called to bring glucose packs in the middle of the night, to assist in bringing [Bishop's] blood sugar back to a normal range." (*Id.* ¶ 32); *see also* (*id.* ¶ 40) (noting "many incidents of low blood sugar" requiring use of "glucose packets" or food that "is not kosher due to the mixing of meat and dairy" to restore appropriate blood sugar levels). In addition, Bishop's allegations demonstrate that the above inadequacies regarding kosher food have been occurring since at least sometime in 2014, when Bishop resumed eating kosher food after he and others stopped eating kosher food due to the inadequacies in the kosher food service. *See* (*id.* ¶ 44). Assuming these allegations are true and making all reasonable inferences in Bishop's favor, the Court concludes that Bishop has sufficiently pled facts demonstrating a substantial burden on his sincerely held religious belief. *See Weir*, 114 F.3d at 820.

The Court also notes that the case law Defendants rely on in arguing that Bishop has pled only a *de minimis* burden on his free exercise rights is distinguishable. For example, Defendants cite *Rapier v. Harris*, 172 F.3d 999 (7th Cir. 1999), and *Smith v. Copeland*, 87 F.3d 265 (8th Cir. 1996), in support of their position, but both *Rapier* and *Smith* involved a determination of *de minimis* burden at the summary judgment stage after the development of a factual record, rather than in the context of a motion to dismiss. *See* (Defs.' Mem. in Supp. at 13, 15); *Rapier*, 172 F.3d at 1001; *Smith*, 87 F.3d at 268. Moreover, for the reasons stated above, Bishop's allegations reflect more than the *de minimis* burdens found in *Rapier* and *Smith*. *See Rapier*, 172 F.3d at 1006 n.4 ("[T]he unavailability of a non-pork tray for Mr. Rapier at 3 meals out of 810 does not constitute more than a de minimis burden on Mr. Rapier's free exercise of religion."); *Smith*, 87 F.3d at 268–69 (concluding that plaintiff's exposure to "an overflowed toilet in his cell for four days" was a "*de minimis* imposition and thus d[id] not implicate constitutional concerns"). Thus, the Court concludes that Bishop has pled a First Amendment claim based on the alleged inadequacies in the kosher food provided at the Moose Lake facility.

With respect to any First Amendment claim arising out of the denial of Bishop's request to allow a volunteer rabbi into the Moose Lake facility kitchen, however, the Court concludes that he has failed to state a claim. As noted above, to state a claim under the First Amendment free exercise clause, Bishop must plead a substantial burden on his ability to practice his religion. *Weir*, 114 F.3d at 820; *Daywitt*, 2015 WL 4094199, at *8.

Bishop alleges that he submitted "requests and a grievance" to Defendants to permit a volunteer rabbi to provide training to Defendants regarding proper handling of kosher food, that Defendants denied these requests, and that Defendants have failed to properly train employees regarding proper kosher food handling in light of the "numerous violations of kosher laws which

[Bishop] has brought to their attention, yet Defendants choose to act in the same manner." (Second Am. Compl. ¶¶ 43, 88). Bishop also alleges, however, that Defendants ultimately "**agree[d]** to allow for said training," though they will not permit the volunteer rabbi in the kitchen at the Moose Lake facility. (*Id.* ¶ 93) (emphasis added). Thus, the government conduct alleged to place a substantial burden on Bishop's ability to practice his religion is Defendants' refusal to allow a volunteer rabbi in the kitchen at the Moose Lake facility as part of training regarding kosher food handling—an allegation that must be viewed in the context of Bishop's allegation that Defendants have agreed to permit such training more generally. *See* (*id.*). While Bishop alleges in conclusory fashion that allowing the volunteer rabbi into the facility's kitchen is "necessary" for the inspection of Defendants' "practices," (*id.*), he does not allege facts plausibly demonstrating that Defendants would be unable to successfully implement training regarding proper kosher food handling due simply to the fact that a volunteer rabbi was not allowed in the Moose Lake facility kitchen. Under these circumstances, the narrow refusal alleged with regard to allowing a volunteer rabbi in the Moose Lake facility kitchen fails to plead a substantial burden on Bishop's free exercise rights.

### ii.     Fourteenth Amendment Claim

Defendants contend that Bishop has failed to state a claim under the Due Process clause of the Fourteenth Amendment. (Defs.' Mem. in Supp. at 14–17). The parties address Bishop's claim under the Fourteenth Amendment as a substantive due process claim. (*Id.*); (Bishop's Mem. in Opp'n at 8–9).

> To establish a violation of an individual's substantive due process rights, the plaintiff must demonstrate **both** that the official's conduct was conscience-shocking, **and** that the official violated one or more fundamental rights that are deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed.

*Norris v. Engles*, 494 F.3d 634, 637–38 (8th Cir. 2007) (internal quotation marks omitted). This standard imposes a heavy burden on an individual asserting a violation of his substantive due process rights. *Hall v. Ramsey County*, 801 F.3d 912, 917 (8th Cir. 2015). Conduct that is "'intended to injure [an individual] in some way unjustifiable by any governmental interest is . . . most likely to rise to the conscience-shocking level.'" *Id.* at 918 (alteration and omission in original) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)). "But when the acts of a government official" constitute "'something more than negligence but less than intentional conduct' the 'totality of the facts in a given case' must be assessed to determine whether behavior is conscience shocking." *Id.* (footnote omitted) (quoting *Lewis*, 523 U.S. at 849, 850).

Defendants first contend that "[w]hile the denial of kosher meals may qualify as a fundamental right for purposes of a due process claim," Bishop is actually receiving kosher meals and again state that Bishop's "generalized complaints . . . at best allege *de minimis* harm" that is "insufficient to support a substantive due process claim." (Defs.' Mem. in Supp. at 15). For the reasons stated above, the Defendants' assertion that Bishop alleges only *de minimis* harm is unavailing. Beyond their *de minimis* harm argument, Defendants do not make any other argument regarding Bishop's failure to plead that his fundamental rights have been violated, and as noted, suggest that "denial of kosher meals may qualify as a fundamental right for purposes of a due process claim." (*Id.*); *see also Ross v. Coughlin*, 669 F. Supp. 1235, 1241, 1242 (S.D.N.Y. 1987) (stating that "courts have recognized that prison authorities must accommodate the rights of prisoners to receive diets consistent with their religious beliefs" and concluding that plaintiff pled a due process claim where he "did not receive a nutritionally adequate diet for ten weeks of his incarceration" due to denial of kosher meals, the provision of other food that was not properly prepared according to kosher laws, and delays in being placed on kosher meal

program). The Court therefore proceeds to Defendants' next argument for dismissal, which is that Bishop's due process claim "must fail because he has failed to allege conduct by Defendants that would shock the conscience or any notion of fairness." (*Id.* at 15).

While the Court appreciates that the "shocks the conscience" standard imposes a high bar for those seeking to demonstrate a violation of their substantive due process rights, the Court concludes that Bishop has sufficiently pled facts that may demonstrate conscience-shocking behavior.[10] Bishop alleges longstanding nutritional inadequacies in the kosher food program at the Moose Lake facility, including the provision of spoiled and foul-smelling food. (Second Am. Compl. ¶¶ 25, 27, 33, 38, 44, 66) (alleging facts regarding deficiencies in kosher food program and history of those deficiencies). He alleges that these inadequacies have caused him to lose a significant amount of weight and suffer episodes of "extremely low blood sugar." (*Id.* ¶¶ 24, 32, 37, 40–41). Bishop alleges that he has informed certain Defendants of these issues and specifically alleges that he submitted "requests" and grievances regarding both the inadequacies in the kosher food program and the health issues he suffered as a result of those inadequacies, to which he has received "vague" or insufficient answers, or no response at all. (*Id.* ¶¶ 12–16, 18, 27, 39).

Assuming these allegations are true and making all reasonable inferences in Bishop's favor, the Court concludes that Bishop has sufficiently pled facts to support a substantive due process claim. The Court makes this determination in light of the fact that while intentionally injurious conduct may be "**most likely** to rise to the conscience-shocking level," conduct that

---

[10]      In his complaint, Bishop appears to argue that the "shocks the conscience" standard should not apply to his due process claim, but the basis for this argument is unclear, as the only case law cited by Bishop in this portion of his complaint applies the "shocks the conscience" standard. *See* (Second Am. Compl. ¶ 45) (citing *Norris*, 494 F.3d at 638). Because the Court concludes that Bishop has sufficiently pled a claim even under the conscience-shocking standard, the Court need not further address Bishop's argument at this time.

constitutes "something more than negligence but less than intentional conduct," requires consideration of the "totality of the facts in a given case' . . . to determine whether the behavior is conscience shocking." *Hall*, 801 F.3d at 918 (quoting *Lewis*, 523 U.S. at 850) (emphasis added); *see also id.* at 918 n.4 ("We have held that the middle range of conduct that **could** shock the conscience in some contexts includes egregious cases of deliberate indifference, recklessness, or gross negligence." (internal quotation marks omitted)). Thus, the Court cannot conclude at this juncture that Defendants are entitled to dismissal of this claim.[11]

### iii.    Liability Under Section 1983

As described above, the Court concludes that Bishop has sufficiently pled violations of his First and Fourteenth Amendment rights. But "when a plaintiff seeks relief under § 1983, his

---

[11]    The Court notes that in Count III of the Second Amended Complaint, Bishop refers to "inhumane treatment," cites the Fourteenth Amendment, and cites to article 1, section 5 of the Minnesota Constitution, which prohibits cruel or unusual punishments. Construing Bishop's complaint liberally, it appears to the Court that in addition to raising a substantive due process claim under the Fourteenth Amendment based on the denial of his right to a religious diet, Bishop is asserting a substantive due process claim based on the conditions of his confinement.

Because Bishop is not a prisoner, but a civilly committed detainee, he cannot bring a claim based on conditions of confinement "directly under the Eighth Amendment." *Lee v. Klingaman*, No. 13-cv-799 (PJS/FLN), 2013 WL 1900564, at *3 (D. Minn. Apr. 18, 2013) (Noel, Mag. J.) *report and recommendation adopted by* 2013 WL 1900561 (May 7, 2013). But "federal courts have consistently held that under the Fourteenth Amendment's due process clause, the protections of the Eighth Amendment are fully applicable to non-prisoners who are held in governmental custody, including civilly committed detainees." *Id.* "This means that the deliberate indifference standard of the Eighth Amendment remains applicable to civilly committed patients challenging the conditions of confinement under the Due Process Clause of the Fourteenth Amendment." *Id.* (internal quotation marks omitted). Defendants do not address this claim that, although not artfully pled, is contained within the Second Amended Complaint. *See* (Second Am. Compl.); *see also* (Bishop's Mem. in Opp'n at 8) (arguing that Bishop has pled claims under the Fourteenth Amendment "by stating how the Defendants have violated his rights to have a nutritionally adequate kosher diet, **and** for having been treated in an inhumane way") (emphasis added). Indeed, noticeably absent from Defendants' memorandum is any mention of the alleged health consequences that Bishop has suffered as a result of the inadequate kosher food at the Moose Lake facility. Because Defendants have not moved the Court for dismissal of Bishop's Fourteenth Amendment claim based on the conditions of his confinement, the Court does not further address the claim at the time.

complaint must set forth specific factual allegations showing what each named defendant allegedly did, or failed to do, while acting under color of state law" to violate his constitutional rights. *Knutson*, 2011 WL 821253, at *4. That is, a civil rights plaintiff "must plead facts showing each defendant's **personal** involvement in alleged constitutional wrongdoing." *Id.*; *see also Ellis v. Norris*, 179 F.3d 1078, 1079 (8th Cir. 1999) (noting that plaintiff pursuing claims under § 1983 must "allege facts supporting any individual defendant's personal involvement or responsibility for the violations"). The doctrine of vicarious liability is inapplicable in § 1983 suits, and thus a defendant can only be liable for his or her own behavior. *Parrish v. Ball*, 594 F.3d 993, 1001 (8th Cir. 2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "[A] supervising officer can be liable for an inferior officer's constitutional violation only 'if he directly participated in the constitutional violation, or if his failure to train or supervise the offending actor caused the deprivation.'" *Id.* (quoting *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997)); *see also S.M. v. Krigbaum*, 808 F.3d 335, 340–41 (8th Cir. 2015) (discussing liability for failure to train or supervise). A supervisor is liable for "corrective inaction" when such inaction "constitutes deliberate indifference toward" the constitutional violation. *Meloy v. Bachmeier*, 302 F.3d 845, 849 (8th Cir. 2002); *Krawiecki v. Hawley*, No. 08-cv-5309 (JMR/RLE), 2010 WL 3269960, at *5 (D. Minn. Aug. 17, 2010) (Rosenbaum, J.) ("'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what' he might see." (quoting *Ottman v. City of Independence*, 341 F.3d 751, 761 (8th Cir. 2003)).

When a claim is brought against a public official in his or her official capacity, the suit is "actually a suit against the entity for which the official is an agent." *Parrish*, 594 F.3d at 997 (internal quotation marks omitted); *see Daywitt*, 2015 WL 4094199, at *12 (noting that official capacity claims against state officials are only another way of pleading an action against the state

itself). "The entity itself—in this case, the State of Minnesota—must be the 'moving force' behind the alleged deprivation of rights." *Daywitt*, 2015 WL 4094199, at *12 (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)). "To establish liability in an official-capacity suit under section 1983, a plaintiff must show either that the official named in the suit took an action pursuant to an unconstitutional policy or custom, or that he or she possessed final authority over the subject matter at issue and used that authority in an unconstitutional manner." *Nix v. Norman*, 879 F.3d 429, 433 (8th Cir. 1989) (citation omitted); *cf. Hafer v. Melo*, 502 U.S. 21, 25 (1991) (noting differences between official- and individual-capacity suits and noting that a "plaintiff in a personal-capacity suit need not establish a connection to a governmental 'policy or custom'").

Defendants contend that Bishop has failed to "plead the personal involvement of any Defendant" and throughout their memorandum state that Bishop has failed to plead the existence of a policy or custom that violates his constitutional rights. (Defs.' Mem. in Supp. at 11, 12, 14, 18–23). While Defendants' argument regarding whether Bishop has sufficiently pled the existence of a policy or custom is not well-developed, this appears to be a reference to the standard applicable to Bishop's claims against Defendants in their official capacities. *See Hafer*, 502 U.S. at 25. The Court first addresses Defendants' arguments regarding personal involvement and then addresses Defendants' argument regarding whether Bishop has sufficiently pled the existence of a policy or custom so as to maintain official-capacity claims against Defendants.

### aa.      Sajdak, Christenson, Erickson, and Kuklis

Defendants contend that Bishop has failed to allege sufficient personal involvement of Sajdak, Christenson, Erickson, and Kuklis because he has pled only non-specific, "catchall statements" regarding their involvement. (Defs.' Mem. in Supp. at 23). The Court disagrees.

As previously noted, Sajdak is the Program Manager of the Moose Lake facility's kitchen, Christenson is the Kitchen Supervisor, and Erickson is the Chief Cook. (Second Am. Compl. ¶¶ 13–15). Kuklis is the registered dietician at the Moose Lake facility. (*Id.* ¶ 16). With regard to each of these Defendants, Bishop alleges that he "brought to [their] attention . . . the poor quality, the possibility of freezer burn or being spoiled and the deficient caloric intake" of the kosher food, but that "nothing was improved." (*Id.* ¶¶ 13–16). Bishop also alleges that "Sajdak, Christenson, Erickson, and Kuklis" informed him that the kosher food vendor "told them that the food could be stored in the freezer for up to two (2) years" and would "still be safe to eat." (*Id.* ¶ 26). Bishop alleges this was "not true," as he contacted "the vendor of the products in question and was told that nothing over 6 months would be appropriate for storing in a freezer." (*Id.*). This allegation specifically pleads involvement by Sajdak, Christenson, Erickson, and Kuklis in actions reasonably leading to the provision of spoiled kosher food.

Finally, Bishop alleges that these Defendants "were each aware of the kosher food that was implemented . . . at the [Moose Lake] facility and continued to do nothing about it to prevent this product from being served nor stopped this from continuing and actively participated in such conduct." (*Id.* ¶ 69); *see also* (*id.* ¶ 81) (similar allegation). While this final allegation, by itself, would not adequately plead the personal involvement of Sajdak, Christenson, Erickson, and Kuklis, the Court must consider the allegations within the complaint as a whole. Having done so, the Court concludes that Bishop sufficiently alleges personal involvement in the denial of Bishop's constitutional rights by sufficiently pleading what Sajdak, Christenson, Erickson, and Kuklis, did or "failed to do, while acting under color of state law" to violate his constitutional rights. *Knutson*, 2011 WL 821253, at *4; *cf. William v. Johnston*, No. 14-cv-369 (DWF/FLN), 2015 WL 1333991, at *5 (D. Minn. Jan. 28, 2015) (Noel, Mag. J.) *report and recommendation*

*adopted by* 2015 WL 1334015 (Mar. 15, 2015) (concluding plaintiff sufficiently pled involvement by defendants where he alleged facts demonstrating that those defendants denied his visitation request); *see also Lomholt v. Holder*, 287 F.3d 683, 684 (8th Cir. 2002) (per curiam) (concluding that plaintiff stated First Amendment free exercise claim against defendant based on allegation that she "refused to help him when he told her" that a different defendant had "warned him to 'drop the subject'" of being "put[] . . . in the hole for [engaging in] religious fasting").

Bishop also alleges that he "gave kitchen staff a menu" reflecting only the kosher meals "that did not contain the non-kosher items for their reference," but that they "refused to utilize [his] suggestions." (*Id.* ¶ 36). Bishop does not specify the "kitchen staff" he refers to, but it is reasonable to infer based on the allegations in the complaint that kitchen staff would include, at a minimum, Erickson, who is the Chief Cook. *See* (*id.* ¶ 15). This allegation further supports the conclusion that Bishop has sufficiently pled Erickson's involvement in the alleged constitutional violations. Likewise, the allegations regarding Kuklis's involvement are further supported by Bishop's allegation that he has been "seen by MSOP's dietician"—Kuklis—to "whom he has complained to about the food quality, and the lack of quantity." (*Id.* ¶¶ 16, 41).

In sum, the Court concludes that Bishop has pled sufficient personal involvement with respect to Sajdak, Christenson, Erickson, and Kuklis.

### bb.    Jesson, Johnston, and Moser

Defendants contend that Bishop has failed to plead sufficient personal involvement regarding supervisory defendants Jesson, Johnston, and Moser.[12] (Defs.' Mem. in Supp. at 20–

---

[12]    The Court takes judicial notice of the fact that Jesson is no longer the Commissioner of DHS, as she was recently appointed to the Minnesota Court of Appeals. Governor Dayton Appoints Commissioner Lucinda E. Jesson and Tracy M. Smith to Minnesota Court of Appeals (Dec. 4, 2015), http://mn.gov/governor/newsroom/pressreleasedetail.jsp?id=102-176024. *Cf. Mitchell v. Home*, 377 F. Supp. 2d 361, 367 (S.D.N.Y. 2005) (noting that courts may take

22). With respect to Jesson and Johnston, the Court agrees with Defendants. Bishop asserts generally with respect to Jesson and Johnston that they "implemented, retained and carried out a policy or de facto standing practice of serving inedible, improper and inadequate kosher meals and non-kosher meals as kosher meals, by the inclusion of non-kosher foods and provision[] or service in a non-kosher manner." (Second Am. Compl. ¶¶ 10–11). Other than this and similar general allegations, *see, e.g.*, (*id.* ¶¶ 10–11, 57, 69, 81, 91), Bishop does not allege any facts specific to Jesson or Johnston that demonstrate their direct involvement, failure to train, or failure to supervise that has caused the alleged deprivation of constitutional rights. This is particularly true in light of the fact that, in the absence of direct participation in the unconstitutional conduct, Bishop must plead facts that plausibly suggest deliberate indifference on the part of Jesson and Johnston. *See Krigbaum*, 808 F.3d at 340–41 (noting that supervisor must have notice of a pattern of unconstitutional conduct committed by subordinates and be personally deliberately indifferent to those acts, and stating that "[a]llegations of generalized notice are insufficient"); *see also Parrish*, 594 F.3d at 1002 (noting that supervisor may be liable for failure to train when "the failure to train amounts to deliberate indifference to the rights" of others (internal quotation marks omitted)); *Meloy*, 302 F.3d at 849 (stating that a supervisor is liable for "corrective inaction" when such inaction "constitutes deliberate indifference toward" the constitutional violation (internal quotation marks omitted)). And while Bishop alleges that Jesson "is responsible in her individual and official capacity to assure that the MSOP is meeting constitutional standards and Minnesota law" and that, as the Executive Director of the MSOP,

---

judicial notice of public documents on a motion to dismiss and taking judicial notice of press release). As a result, any claim for injunctive relief against Jesson is moot. *See Tara Enters., Inc. v. Humble*, 622 F.2d 400, 401 (8th Cir. 1980) (concluding that claims for equitable relief against former officials were moot). Thus, the only potential remaining claim against Jesson is an individual-capacity claim for monetary damages.

Johnston is responsible for ensuring that MSOP clients "within her care" are receiving "proper food as described in Minnesota Rule[] 4665.2900," "general responsibility for supervising the operations of" an institution is not enough to establish personal liability in a § 1983 action. *See* (Second Am. Compl. ¶¶ 10–11); *Outz v. Cummins*, 825 F.2d 1276, 1277 (8th Cir. 1987).

With respect to Moser, however, the Court disagrees with Defendants. Unlike his allegations with respect to Jesson and Johnston, Bishop specifically alleges that Moser "continued to allow the service of" inadequate kosher food "even after [Bishop] brought to the attention of [Moser] . . . the inadequate meals, and the poor quality of the food." (Second Am. Compl. ¶ 12). This specific allegation with respect to Moser, considered in the context of other allegations in the Second Amended Complaint, are sufficient to state a claim against Moser, both to the extent they establish some direct involvement in the alleged constitutional deprivation and to the extent they demonstrate a failure to supervise.[13] *See Meloy*, 302 F.3d at 849.

A supervisory defendant may be subject to liability under § 1983 when the supervisor: (1) received "notice of a pattern of unconstitutional acts committed by subordinates"; (2) "[d]emonstrated deliberate indifference to or tacit authorization of the offensive acts"; and (3) "[f]ailed to take sufficient remedial action." *Parrish*, 594 F.3d at 1002. In addition, the supervisor's failure must proximately cause the plaintiff's injury. *Id.* Assuming Bishop's allegations are true and construing all reasonable inferences from those facts in the light most favorable to Bishop, Bishop alleges inadequacies in the kosher food program ranging from significant caloric deficiencies, to spoiled food and food that was made non-kosher through

---

[13]     To clearly distinguish between the Court's reasoning with respect to Jesson, Johnston, and Moser, the Court again notes the absence of any **specific** allegation that Jesson and Johnston were **personally** informed of the ongoing and numerous issues with the kosher food program at the Moose Lake facility. Bishop has made such an allegation with regard to Moser, however, and this informs the Court's reading of the other allegations contained within the Second Amended Complaint.

contamination. (*Id.* ¶¶ 34, 36). Bishop's specific allegation regarding Moser demonstrates that Moser was informed of persistent problems, as Bishop alleges that he informed Moser of "inadequate **meals**," rather than a single or isolated inadequacy. (*Id.* ¶ 12) (emphasis added). Nonetheless, Bishop alleges that Moser continued to permit service of these inadequate meals, and that Bishop has been denied a nutritionally adequate religious diet and has suffered associated health problems. (*Id.* ¶¶ 12, 70, 78–79, 82). These allegations sufficiently plead a failure to supervise.[14] *See Strope v. Cummings*, No. 06-cv-3021, 2008 WL 508698, at *2 (D. Kan. Feb. 22, 2008) (finding sufficient allegations for supervisory liability when plaintiff alleged that he "filed grievances concerning the alleged violations," violations were ongoing, there was improper or insufficient investigation of grievances, and the supervisory defendants "did not take corrective actions to remedy the violations"); *see also Krigbaum*, 808 F.3d at 340 ("To impose supervisory liability, other misconduct must be very similar to the conduct giving rise to liability." (internal quotation marks omitted)). Discovery may reveal that Moser acted with something less than deliberate indifference or that Moser did not in fact have the requisite notice,

---

[14]     The Court notes that Bishop alleges that Sajdak, Christenson, Erickson, and Kuklis have "no official training in the food service industry, specifically related to Kosher food handling"; that he asked Defendants if a rabbi could provide kosher food training; that "Defendants' [sic] have an affirmative duty to assure that their employees are properly trained in the field [in] which they are working in"; and that they have failed in this duty in light of the "numerous violations of kosher laws, which [Bishop] has brought to their attention, yet Defendants choose to act in the same manner." (*Id.* ¶¶ 13–16, 87–88). He also alleges that Moser was "informed of" the availability of training regarding kosher food handling. (*Id.* ¶ 92). To the extent Bishop seeks to hold Moser or any other Defendant liable based on a failure to train, however, the Court finds that his allegations do not support such liability in light of the fact that Defendants have agreed to allow training regarding kosher food handling. (*Id.* ¶ 93). The fact that Defendants have not agreed to allow a volunteer rabbi into the Moose Lake facility's kitchen as part of that training does not allege deliberate indifference to Bishop's rights based on deficiencies in training. *See Parrish*, 594 F.3d at 1002 (noting that a "supervisor's failure to train an inferior officer may subject the superior to § 1983 liability in his individual capacity where the failure to train amounts to deliberate indifference to the rights" of others (internal quotation marks omitted)).

but at this juncture the Court only considers whether Bishop has made sufficient allegations to state a claim for relief against Moser.

In sum, the Court concludes that Bishop has sufficiently pled personal involvement as to Moser, but has failed to do so with respect to Jesson and Johnston.

### cc.    Official Capacity Claims

As noted above, Defendants appear to move to dismiss allegations against Defendants in their official capacities based on their assertion that Bishop has failed to plead a policy or custom leading to the deprivation of his constitutional rights. *See, e.g.*, (Defs.' Mem. in Supp. at 11, 12). While Bishop does not rely on a particular, formal policy that has led to a constitutional deprivation, a plaintiff may establish "liability . . . through proof that the alleged misconduct was so pervasive among the non-policy making employees" of a government entity that it constitutes "a custom or usage with the force of law."[15] *McGautha v. Jackson County*, 36 F.3d 53, 56 (8th Cir. 1994) (internal quotation marks omitted). Thus, when a plaintiff alleges that a government entity's unwritten or *de facto* policy is the moving force behind the deprivation of his rights, the court considers whether a "custom" has been sufficiently alleged. *See Lollie v. Johnson*, No. 14-cv-4784 (SRN/HB), 2015 WL 3407931, at *4–5 (D. Minn. May 27, 2015) (Nelson, J., adopting report and recommendation of Bowbeer, Mag. J.). Specifically, a plaintiff must sufficiently plead facts with respect to the following three elements:

---

[15]    Bishop states that the "MSOP does not even have a policy that regulates the kosher food" but does have a "Meal Service policy #302.040, which is very vague in its wording." (Second Am. Compl. ¶ 42). He also alleges the existence of a "Spiritual Practices Policy #302.300" which "only makes reference [to the fact] that a spiritual diet menu is available" upon request. (*Id.*). While Bishop refers to these formal policies, the allegations in the Second Amended Complaint are not directed at any constitutional violation brought about by implementation of the requirements in these formal policies, but are directed at the alleged "policy and/or de facto standing practice of serving inedible, improper and inadequate kosher meals and non-kosher meals as kosher meals, by the inclusion of non-kosher foods and provision[] or service in a non-kosher manner." *See, e.g.*, (*id.* ¶¶ 10–16); *see also* (*id.* ¶¶ 65–66, 69, 79, 81).

> "(1)   The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees;
> (2)   Deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and
> (3)   Th[e] plaintiff['s] injur[y] by acts pursuant to the governmental entity's custom, *i.e.,* [proof] that the custom was the moving force behind the constitutional violation."

*Id.* at *5 (alterations in original) (quoting *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)).

As previously described, Bishop alleges longstanding nutritional inadequacies in the kosher food program at the Moose Lake facility, including the provision of spoiled and foul-smelling food. (Second Am. Compl. ¶¶ 25, 33–38, 44, 66) (alleging facts regarding deficiencies in kosher food program and history of those deficiencies). He also alleges that in addition to the inadequacies in the kosher food program that he has experienced, all other patients at the Moose Lake facility who previously ate kosher meals stopped doing so after facing similar issues. (*Id.* ¶ 44). Bishop further alleges that he has attempted to work with kitchen staff to address the issues, brought the issues to the attention of Sajdak, Christenson, Erickson, and Kuklis, which did not result in any improvement, and submitted "requests" and grievances regarding both the inadequacies in the kosher food program and the health issues he suffered as a result of those inadequacies, to which he has received "vague" or insufficient answers, and/or inaction. (*Id.* ¶¶ 13–16, 27, 36, 39, 41). In addition, as noted above, he specifically alleges that Moser—the Director of the MSOP—"continued to allow the service of" inadequate kosher food "even after [Bishop] brought to the attention of [Moser] . . . the inadequate meals, and the poor quality of the food." (*Id.* ¶ 12). Bishop also plausibly alleges that it is the above conduct that has led to an unconstitutional denial of a nutritionally adequate religious diet. *See* (*id.* ¶¶ 12, 70, 78–79, 82).

Based on the above allegations, the Court concludes that Bishop has sufficiently pled the existence of a custom for purposes of an official capacity claim. The Court further concludes that, for reasons similar to those discussed above, Bishop may pursue official capacity claims against Moser, Sajdak, Christenson, Erickson, and Kuklis. *See Norman*, 879 F.3d at 433 ("To establish liability in an official-capacity suit under section 1983, a plaintiff must show . . . that the official named in the suit took an action pursuant to an unconstitutional policy or custom . . . .").

In addition to their other arguments for dismissal, Defendants assert that any claim for injunctive relief against an official acting in their official capacity would properly include, "at most" Jesson, Johnston, and Moser, as these are the only parties that would have "the ability to deliver the requested relief or have a connection with enforcement of the alleged wrongs." (Defs.' Mem. in Supp. at 29 n.5). But this is based only on Defendants' conclusory statement and analysis. The Court declines to recommend dismissal of any official capacity claims on these grounds at this stage of the litigation, and concludes that those matters should be addressed after development of the factual record.

### d.      Qualified Immunity

Defendants also contend that they are entitled to qualified immunity with regard to Bishop's claims brought against them in their individual capacities and pursuant to § 1983. (Defs.' Mem. in Supp. at 29–30). "Qualified immunity shields government officials from liability in their individual capacity so long as the official has not violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Parrish*, 594 F.3d at 1001 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "The applicability of the qualified immunity doctrine is a question of law and, when qualified immunity is raised as a

defense, courts analyze the application of qualified immunity by first addressing 'whether the allegations amount to a constitutional violation, and then, whether that right was clearly established.'" *Beaulieu*, 2008 WL 2498241, at *27 (quoting *Sanders v. City of Minneapolis*, 474 F.3d 523, 526 (8th Cir. 2007)).

Defendants contend that because Bishop has not "established infringement of a constitutional right by way of his *de minimis* complaints about the quality of the kosher meals served by the MSOP" they are entitled to qualified immunity and this Court "need not consider whether any of the alleged rights were clearly established at the time of the purported violation." (Defs.' Mem. in Supp. at 30). Thus, Defendants' argument for application of qualified immunity relies on their earlier *de minimis* infringement arguments. *See* (*id.*). Because the Court concludes that Bishop has sufficiently pled a violation of his constitutional rights, however, and Defendants do not address whether any of the rights at issue were clearly established, Defendants argument regarding qualified immunity must fail at this time. *See Beaulieu*, 2008 WL 2498241, at *27 ("[P]laintiffs have alleged numerous constitutional violations that this Court has determined cannot be dismissed for failure to state a claim. Having met the first prong to defeat a claim of qualified immunity, the Court must then determine whether . . . the constitutional right was clearly established . . . . However, that determination is a fact-intensive inquiry and must be undertaken in light of the specific context of the case, not as a broad general proposition." (internal quotation marks omitted)). The Court therefore recommends that Defendants' Motion to Dismiss be denied to the extent Defendants seek dismissal of any individual capacity-claims based on the doctrine of qualified immunity.

### e.      RLUIPA

Defendants argue that any RLUIPA claim must be dismissed because Bishop has failed to allege facts related to either threshold requirement for the application of RLUIPA. (Defs.' Mem. in Supp. at 17–18). RLUIPA provides:

> (a) General rule
>
> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> >
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). This provision only applies however when "the substantial burden is imposed in a program or activity that receives Federal financial assistance" or when "the substantial burden affects, or removal of that substantial burden would affect, commerce with foreign nations, among the several States, or with Indian tribes." *Id.* § 2000cc-1(b) (addressing "[s]cope of application" of RLUIPA).

As Defendants note, the Second Amended Complaint alleges no facts relating to these threshold requirements. *See generally* (Second Am. Compl.). Bishop's "failure to plead such matters renders his claim legally deficient" and his RLUIPA claims must be dismissed. *Gutman v. Wriggelsworth*, No. 1:09-cv-628, 2010 WL 1814816, at *4 (W.D. Mich. Feb. 4, 2010) (dismissing RLUIPA claim in context of defendants' Rule 12(b)(6) motion because plaintiff did "not allege[] that [d]efendants receive federal funding or that the substantial burden he suffered affected (or would have affected) 'commerce with foreign nations, among the several States, or with Indian tribes'" (quoting § 2000cc-1(b)); *see also Murray v. Kansas Dep't of Corr.*, No. 07-3276, 2009 WL 1617664, at *3 (D. Kan. June 9, 2009) ("Plaintiff cannot invoke RLUIPA

because he has not alleged that [the Kansas Department of Corrections] received federal funding nor has Plaintiff alleged that he experienced a substantial burden that would affect interstate or foreign commerce. Accordingly, as pleaded in Plaintiff's Amended Complaint, this Court finds that RLUIPA does not apply to this case, and therefore, dismisses Plaintiff's cause of action for failure to state a RLUIPA claim."); *Ephraim v. Angelone*, 313 F. Supp. 2d 569, 575 (E.D. Va. 2003) ("Plaintiff has not alleged sufficient facts to properly invoke the statute. The statute explicitly requires that [the] substantial burden complained of be imposed in a program or activity that receives federal financial assistance or that the alleged burden affect interstate or foreign commerce. Thus, the general rule in subsection (a) does not become applicable until the threshold of subsection (b) has been met." (citation omitted)).

In opposition to Defendants' arguments regarding his RLUIPA claim, Bishop states that the "MSOP education department receives federal funds" and that "the policies . . . affect[] commerce, as [Bishop] is not allowed to order kosher food from wherever he may choose to order it from, and is solely subjected to what . . . MSOP choses [sic] to purchase or what MINCORR provides in the canteen." (Bishop's Mem. in Opp'n at 9–10). Bishop makes these assertions for the first time in his responsive brief, but does not seek leave to amend his Second Amended Complaint, which he has already done several times in this matter. *See* (*id.*); (Pl.'s Mot. for Leave to File First Am. Compl.) [Doc. No. 26]; (Mot. to Dismiss Compl.) [Doc. No. 45]; (Pl.'s Mot. for Leave to File a Second Am. Compl.) [Doc. No. 48]. Moreover, Bishop "cannot amend his pleadings through an argument in a brief." *Kalu v. Brooklyn Park Police/Federation*, No. 15-cv-112 (SRN/JJK), 2015 WL 5719462, at *8 (D. Minn. Sept. 28, 2015) (Nelson, J., adopting report and recommendation of Keyes, Mag. J.) (citing *Morgan Distrib. Co., Inc. v. Unidymic Corp.*, 868 F.3d 992, 995 (8th Cir. 1989)) (rejecting pro se

plaintiff's effort to assert in his response in opposition to motion to dismiss that defendant police department "failed to train its officers on proper procedures" because plaintiff "never mention[ed]" such a claim in his amended complaint). Therefore, the Court recommends dismissal of Bishop's RLUIPA claim for failure to state a claim. Because, however, the deficiency in Bishop's RLUIPA claim may ultimately be cured by re-pleading this claim with sufficient factual allegations as to the threshold requirements discussed above, and because the Court cannot conclude at this time that allowing Bishop an opportunity to amend his RLUIPA claim would be futile, the Court recommends granting Bishop leave to amend his Second Amended Complaint **only** with respect his RLUIPA claim. *Murray*, 2009 WL 1617664, at *3. Bishop shall have twenty-one days from the date of any order adopting this portion of this Report and Recommendation to file this a third amended complaint.

### B.    Motion for Amicus Curiae[16]

As noted, Daywitt has filed a Motion for Amicus Curiae, in which he seeks leave to file "an *Amicus Curiae* in" this case. (Mot. for Amicus Curiae at 1). Daywitt states that he "is an interested party in the matter as [Bishop's] spiritual liaison." (*Id.*). Daywitt contends that "the information that is contained within the attached document is both timely and useful for the court to obtain a full view of the inability of the MSOP to provide an adequate kosher diet" and that "the insights reflected by [Daywitt] in the attached documents, are not available from the parties, or are from a different more experienced perspective of one who is a lifetime practitioner of the Orthodox Jewish faith." (*Id.* at 2). Therefore, Daywitt asks that he be "granted permission . . . to file . . . the attached document." (*Id.* at 3). Daywitt's references to "the attached document"

---

[16]    The Motion for Amicus Curiae is arguably a non-dispositive motion, but because it relates to Defendants' Motion to Dismiss, the Court makes a recommendation with regard to the Motion for Amicus Curiae.

appear to be references to Daywitt's Memorandum and Amicus Curiae of Kenneth Daywitt in Support of Plaintiff ("Amicus Memorandum") [Doc. No. 62].

To the extent Daywitt's Motion for Amicus Curiae seeks permission to **file** his Amicus Memorandum, the Court recommends that the motion be denied as moot because the Amicus Memorandum was filed along with the Motion for Amicus Curiae when both documents were submitted to the Court. *See* (Mot. for Amicus Curiae at 3); (Amicus Mem.).

To the extent the Motion for Amicus Curiae asks the Court to **rely** on the arguments and information contained therein to reach certain conclusions regarding the Motion to Dismiss, the Court recommends that the motion be denied. The Court has reviewed the contents of the Amicus Memorandum, but the information and arguments contained therein are inconsequential to the Court's analysis. Specifically, the information and arguments are either repetitive of information and argument brought to the Court's attention through the allegations in the Second Amended Complaint or the parties' memoranda, irrelevant in light of the current posture of this case, and/or simply unhelpful. *See generally* (Amicus Mem.); *see also* (Second Am. Compl.); (Bishop's Mem. in Opp'n). For instance, Daywitt seeks to offer information about "kosher food and its preparation," seeks to explain why food provided at the Moose Lake facility is not kosher, and explains that maintaining a kosher diet "has spiritual meaning to an Orthodox Jew." (Amicus Mem. at 3). But on a motion to dismiss, the Court must assume that all facts alleged in the Second Amended Complaint are true, including Bishop's allegations that food served at the Moose Lake facility is not in fact kosher due to non-kosher contents and/or improper preparation or service and Bishop's allegation that he is an "observant Jewish patient who attempts to adhere to the Orthodox Jewish school of thought in all aspects of his life," including the practice of maintaining a kosher diet. *See* (Second Am. Compl. ¶¶ 30, 36, 47, 66). By way of another

example, Daywitt's arguments regarding Eleventh Amendment immunity are actually consistent with Defendants' position regarding the application of the amendment and Daywitt does not account for the fact that Defendants only seek dismissal of certain claims against them based on Eleventh Amendment immunity. *Compare* (Amicus Mem. at 6–7) (arguing that the Eleventh Amendment is "no bar" to Defendants' "personal liability for their unconstitutional acts") *with* (Defs.' Mem. in Supp. at 28–29) (arguing that claims for monetary relief against Defendants in their official capacities must be dismissed pursuant to the Eleventh Amendment). Moreover, Daywitt's arguments regarding RLUIPA are not responsive to Defendants' challenge to Bishop's RLUIPA claims. *See* (Amicus Mem. at 6).

In sum, for the reasons stated above, the Court recommends that the Motion for Amicus Curiae be denied.

## IV.    RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.    Defendants Lucinda Jesson, Nancy Johnston, Kevin Moser, Steve Sajdak, Joanne Christenson, Brian Erickson, and Lisa Kuklis's (collectively "Defendants") Motion to Dismiss [Doc. No. 55] be **GRANTED in part** and **DENIED in part** as follows:

      a.    The Court recommends that the motion be **GRANTED** to the extent Defendants seek: (1) dismissal of any claim for monetary damages against them in their official capacities and dismissal of all state law claims against them in their official capacities based on the Eleventh Amendment; (2) dismissal of any claim based on

Minnesota Rule 4665.3000; (3) dismissal of Bishop's First Amendment claim based on the denial of his request to allow a volunteer rabbi into the Moose Lake facility kitchen; (4) dismissal of federal constitutional claims against Defendants Jesson and Johnston in both their individual and official capacities; and (5) dismissal of Bishop's RLUIPA claims, although Bishop may amend his Second Amended Complaint only with respect to his RLUIPA claims no later than **twenty-one (21) days** following the date of any order adopting this Report and Recommendation; and

b.      The Court recommends that the motion be **DENIED** in all other respects.

2.      Pro Se Motion for Leave to File Amicus Curiae on Behalf of Plaintiff [Doc. No. 61] filed by Kenneth Steven Daywitt be **DENIED**.


Dated: February 12, 2016

 *s/Steven E. Rau*
STEVEN E. RAU
United States Magistrate Judge

**Notice**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore, not appealable directly to the Eighth Circuit Court of Appeals.

Under D. Minn. LR 72.2(b)(1) "a party may file and serve specific written objections to a magistrate judge's proposed findings and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after objections are filed; or (2) from the date a timely response is filed.